UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

MIRIAM ZAMBRANO-LAMHAOUHI,

Plaintiff,

-against-

NEW YORK CITY BOARD OF EDUCATION,
HOWARD KWAIT, *individually and in his official
capacity*, WINIFRED RADIGAN, *individually and
in her official capacity*, ELIZABETH MCOLLOUGH,
*individually and in her official capacity*, NANCY
ESPOSITO, *individually and in her official capacity*,
LORRAINE HANES, *individually and in her official
capacity*, and MERCEDES QUALLS, *individually and
in her official capacity*,

Defendants.

--------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 2 1 2011 ★

BROOKLYN OFFICE

MEMORANDUM & ORDER

08-CV-3140 (NGG) (RER)



NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Miriam Zambrano-Lamhaoui ("Plaintiff") brought suit against the Defendants,

alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e

et seq.; 42 U.S.C. § 1983; and state and city anti-discrimination laws. (Am. Compl. (Docket

Entry # 2).) Defendants move for summary judgment under Rule 56 of the Federal Rules of

Civil Procedure. (Docket Entry # 40.) For the reasons stated below, Defendants' motion is

granted in part and denied in part.

## I.    Summary Judgment Standard

A motion for summary judgment must be granted if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the

court may not "make credibility determinations or weigh the evidence," but "must draw all

reasonable inferences in favor of the nonmoving party." Reeves v. Sanderson Plumbing Prods.,

Inc., 530 U.S. 133, 149, 150 (2000). Further, the burden of showing the absence of any genuine dispute as to a material fact rests on the movant. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323. A grant of summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

The party opposing summary judgment is not entitled to rely on unsworn allegations in the pleading, but must instead "show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001). Therefore, the court will not take into account the unsworn allegations in Plaintiff's Amended Complaint, but will take into account Plaintiff's sworn charge to the Equal Employment Opportunity Commission ("EEOC") (Defs.' Aff. (Docket Entry # 43) Ex. LL). See Fitzgerald, 251 F.3d at 361. Even where a statement is sworn, the information therein should not be credited if it constitutes hearsay "that would not be admissible at trial if

2

testified to by the affiant." Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004). "Nor is a genuine issue created merely by the presentation of assertions that are conclusory." Id.

Plaintiff's opposition to Defendants' motion for summary judgment is based largely on her own deposition testimony. The Second Circuit has held that, "in certain extraordinary cases," where a plaintiff's opposition to summary judgment is based entirely on the plaintiff's own testimony, and where that testimony is so inconsistent and contradictory that no reasonable jury could believe it, a district court may decline to credit the plaintiff's testimony and grant summary judgment. See Rojas v. Roman Catholic Diocese of Rochester, -- F.3d -- , No. 10-4132-cv, 2011 WL 4552460, at *5-*6 (2d Cir. Oct. 4, 2011) (citing Jeffries v. City of New York, 426 F.3d 549 (2d Cir. 2005)). The Second Circuit clarified, however, that this holding does "not suggest that district courts should routinely engage in searching, skeptical analyses of parties' testimony in opposition to summary judgment." Id. at *6. In the instant case, Plaintiff's testimony is not so inconsistent or contradictory that no reasonable jury could believe it. Therefore, the court will credit it, except where it is conclusory or based on hearsay.

## II. BACKGROUND

### A. Events Prior to Plaintiff's Maternity Leave

At the time of the events in question, Plaintiff had been employed by the New York City Board of Education ("BOE") since February 1996. (Defs.' 56.1 Statement ("DS") (Docket Entry # 41) ¶¶ 2-3; Pl.'s 56.1 Statement ("PS") (Docket Entry # 45) ¶¶ 2-3.) In September 2001, Plaintiff received tenure as a teacher. (DS ¶ 5; PS ¶ 5.) In January 2002, she was appointed for a probationary term as an assistant principal of foreign languages at John Bowne High School ("John Bowne"). (DS ¶ 7; PS ¶ 7.) Plaintiff was rated satisfactory by her supervisor, Frank McQuail, who was then the principal of John Bowne. (Defs.' Aff. Ex. C at 13.)

In October 2003, Plaintiff was injured at work, and subsequently took a leave of absence of approximately three months. (DS ¶¶ 19-20; PS ¶¶ 19-20; Pl.'s Aff. (Docket Entry # 46) Ex. F.) She was ultimately awarded paid leave for only a portion of that period. (DS ¶¶ 21-22; PS ¶¶ 21-23; Pl.'s Aff. Ex. G.)

Defendant Howard Kwait ("Kwait") became the principal of John Bowne in June 2006, at which time Plaintiff was pregnant. (DS ¶¶ 8, 24; PS ¶¶ 8, 24, 26.) At a meeting in which he introduced himself to staff, Kwait stated, in sum or substance, that he expected staff to "do [their] job to the fullest" and that he did not care if they "ha[d] families or kids to attend to or pick up." (PS ¶ 24; Pl.'s Aff. Ex. B at 6.)

Kwait assigned Plaintiff to help hire a Spanish teacher, in the summer of 2006, even though her contract did not permit her to work over the summer. (DS ¶ 26; PS ¶ 26; Pl.'s Aff. Ex. B at 7; Defs.' Aff. Ex. LL ¶ 4.) In August 2006, Plaintiff informed Kwait that she expected to give birth in early October, and would then be going on maternity leave. (DS ¶ 28; PS ¶ 28.) When the 2006 school year started, Plaintiff requested that she be "excused from hallway duty and hall patrol and cafeteria duty due to her pregnancy." (PS ¶ 28.) Kwait denied this request. (Id.)

Kwait proceeded to subject Plaintiff to a "campaign" of "continuous" "harassment," by "stand[ing] outside her class," giving her dirty looks if she had to go to the bathroom during meetings, and following her down the hall and "yell[ing]" at her if he saw her going to the bathroom during one of her classes. (Defs.' Aff. Ex. C at 27-28, 30, 32; Defs.' Aff. Ex. LL ¶ 6.) In September 2006, Kwait observed a student with her head down on her desk in Plaintiff's classroom; he entered the class and roused the student, thereby "taking away [Plaintiff's] authority" and causing her students to think she was "in trouble." (DS ¶ 29; PS ¶ 29; Defs.' Aff.

Ex. C at 27.) In general, Kwait indicated his disdain for Plaintiff through "his body language" and "the way he talk[ed]" to her; he was "condescending, like [she was] a nobody because [she was] pregnant." (Defs.' Aff. Ex. C at 30, 33.)

During this period, Kwait denied Plaintiff the opportunity to participate in the third course of a three-year professional development program, the first two years of which Plaintiff had completed. (PS ¶ 29; Defs.' Aff. Ex. C at 28-30, 35 & Ex. LL ¶ 5.) Kwait cited the imminence of Plaintiff's maternity leave and said, "Well, you're pregnant, so it doesn't matter if you get to the training or not." (Defs.' Aff. Ex. C at 28-29.) In fact, Plaintiff would have only missed one of the monthly course meetings, for which there were, in any event, makeup sessions. (Id. 29, 38.) Defendant Winifred Radigan ("Radigan"), a BOE superintendant and Kwait's supervisor (DS ¶¶ 10-11), was scheduled to teach the course. (Defs.' Aff. Ex. C at 35.)

On October 3, 2006, Plaintiff informed Kwait that she planned to work until her October 10, 2006 due date. (DS ¶ 30; PS ¶ 30.) Kwait told her that, if she planned to return to work less than six weeks after giving birth, school regulations required that she provide a doctor's note stating she was fit for duty. (DS ¶ 31; PS ¶ 31; Defs.' Aff. Ex. N.) Plaintiff worked until October 6, 2006, the last school day before her due date. (DS ¶ 33; PS ¶ 33.) On Plaintiff's last day at work, she requested paperwork from school administrators regarding her maternity leave. (DS ¶¶ 32, 34; PS ¶¶ 32, 34.) Defendants claim that all such paperwork was provided, which Plaintiff denies. (DS ¶ 34; PS ¶ 34.)

Plaintiff testified in her deposition that she thought Kwait and Radigan discriminated against her on the basis of her pregnancy, adding that her union representative told her that Radigan "targets young mothers with babies." (Defs.' Aff. Ex. C at 33-35.)

## B.    Plaintiff's Return from Leave

Plaintiff returned to work on November 21, 2006 and met with Kwait. (DS ¶ 39; PS ¶¶ 39, 40.) Kwait later stated that, on the day she returned, Plaintiff told him that her doctor had "not cleared" her to return to work and that "he could not allow [Plaintiff] to return if her doctor would not approve her return." (Defs.' Aff. Exs. U, JJ.)[1] However, as noted above, Kwait had previously informed Plaintiff that she would need a doctor's note to return to work only if she returned *less* than six weeks after giving birth. (DS ¶ 31; PS ¶ 31; Defs.' Aff. Ex. N.) The day on which Plaintiff returned, November 21, 2006, was exactly six weeks after she gave birth on October 10. Therefore, it was Plaintiff's understanding that she did not need a doctor's note. (Pl.'s Aff. Ex. B at 25-26.) Nevertheless, on November 21, 2006, when Kwait told her that she needed a note, Plaintiff called her doctor. (DS ¶¶ 40-41; PS ¶¶ 40-41.) At about 11:30 a.m., the doctor's office faxed a note to Kwait, stating that Plaintiff could return to work on December 11, 2006, "with some limitations." (DS ¶ 43; PS ¶ 43; Defs.' Aff. Ex. S.) According to Defendants, Kwait "determined that plaintiff was not cleared to return to work." (DS ¶ 44.) However, according to Plaintiff, she explained to Kwait that the note contained a typographical error; that December 11, 2006 was actually the date of her next doctor's appointment; and that, in fact, her doctor had told her she was "fine to return to work." (PS ¶ 43.) According to Defendants, Kwait had other matters to attend to and told Plaintiff to stay in his office and complete paperwork until

---

[1] Kwait said this at a November 27, 2006 disciplinary conference in which testimony was taken about the events of November 21, 2006. The account of Kwait's statements at the conference is taken from unsworn documents, provided by Defendants, summarizing that testimony. Though these summaries would constitute hearsay if relied upon by Defendants, see Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005), Plaintiff may rely on them, see Fed. R. of Evid. 801(d)(2)(B) (a statement is "not hearsay" if it is "offered against a party and is . . . a statement of which the party has manifested an adoption or belief in its truth . . . ."); see Spiegel v. Schulmann, 604 F.3d 72, 82 (2d Cir. 2010) (under Rule 801(d)(2), statements by agents of a party are admissible against that party on summary judgment review).

he returned; Plaintiff, in contrast, states that she went to a security desk because Kwait specifically prohibited her from staying in his office. (DS ¶ 45; PS ¶ 45.) At about 1:00 p.m., the doctor faxed a second note, which was marked "corrected copy" and which indicated that December 11, 2006 was the date of a scheduled appointment and that Plaintiff could "return to work with some limitations." (DS ¶ 46; PS ¶ 46; Defs.' Aff. Ex. T.)

The parties disagree about what happened next. According to Plaintiff, she was waiting at the security desk when she saw Kwait return to his office; she followed Kwait down the hall and then saw him in his office looking at the second doctor's note. (PS ¶¶ 47-48.) Kwait's secretary then exited Kwait's office to tell Plaintiff that Kwait could not "waste a whole day" on her and that they could meet at 5:00 p.m. (Id. ¶ 48.) Plaintiff responded that she had a baby at home, had a second child she needed to pick up, that she had not had any bathroom breaks, and that she could only wait until 3:15. (Id.) Kwait, "now outraged," then approached Plaintiff and told her she had to leave the building. (Id. ¶¶ 48-49; Defs.' Aff. Ex. C at 50.) Plaintiff said "okay," but also asked if Kwait had received the second doctor's note. (PS ¶¶ 48-49.) Kwait repeated that Plaintiff had to leave and, although Plaintiff had already begun to walk toward the exit, signaled to security officers to escort her out. (Id. ¶¶ 49-50.)

According to Defendants, when Kwait returned to his office, his secretary told him that Plaintiff, instead of staying in his office as directed, had gone elsewhere in the school building "to complete her contractual day as directed by her union." (DS ¶ 47.) Kwait subsequently encountered Plaintiff in a hallway and told her to leave the building, "as she was not cleared to return to work and had not complied with his directive to remain in his office" and complete paperwork. (Id. ¶ 48.) Kwait testified that there were no other "policies" justifying his demand that Plaintiff leave the building. (Defs.' Aff. Ex. F at 25.) According to Defendants, Plaintiff did

not comply with Kwait's directive, even after being asked to leave a second time, so Kwait had school security escort her out. (DS ¶¶ 49-50.) Kwait further testified at the November 27, 2006 disciplinary conference that he had Plaintiff removed from the school building because she had "provided a number of faxed doctor's notes one of which indicated that she could not return to work until a later date. In view of that note," Kwait told Plaintiff that "she could not return to work until the matter was clarified." (Id.)

## C. Plaintiff's Subsequent Discipline and Assignments

On November 27, 2006, a disciplinary conference was held in connection with Plaintiff's alleged insubordination in not obeying Kwait's directive that she leave the John Bowne building on November 21. (DS ¶¶ 55-56; PS ¶¶ 55-56.) The same day, Radigan, who had presided at the conference, sent Plaintiff a letter informing her that she found that Plaintiff's conduct had been insubordinate and warranted "additional disciplinary action up to and including discontinuance of probation," i.e., Plaintiff's probationary period as an assistant principal. (DS ¶ 57; PS ¶ 57; Defs.' Aff. Ex. U.)

That same day, Kwait completed an evaluation of Plaintiff, covering the period between August 2006 and November 2006. (DS ¶ 62; PS ¶ 62.) He rated Plaintiff "unsatisfactory," stating as his reasons her alleged insubordination and her "excessive absences." (DS ¶ 63; PS ¶ 63; Defs.' Aff. Ex. Y.) Kwait noted in the evaluation that Plaintiff had been absent thirty-two days during the covered period. (Defs.' Aff. Ex. Y at 1.) This total corresponds to the number of school days Plaintiff missed while on maternity leave. (PS ¶ 63; Pl.'s Aff. Ex. P.) In the evaluation, Kwait recommended that Plaintiff's probationary service as an assistant principal be discontinued. (DS ¶ 64; PS ¶ 64; Defs.' Aff. Ex. Y at 2.) On January 2, 2007, Radigan affirmed Kwait's evaluation, and terminated Plaintiff's probationary service as assistant principal. (DS

8

¶¶ 70, 72; PS ¶¶ 70, 72.)[2]  As a result, Plaintiff was demoted to the status of "teacher in reserve,"

which entailed a salary drop from approximately $85,000 a year to approximately $59,000 a year

and a loss of job security.  (DS ¶ 71; PS ¶ 71; Defs.' Aff. Ex. C at 62-63; Pl.'s Aff. Ex. Q.)

After the disciplinary conference, Radigan reassigned Plaintiff to Springfield Gardens

Senior High School ("Springfield Gardens").  (DS ¶ 57; PS ¶ 57; Defs.' Aff. Ex. U.)  According

to Plaintiff, Springfield Gardens was "known to be a violent school and [was] used as a tool to

punish employees in re-assignment."  (PS ¶ 58.)  Radigan submitted the request to reassign

Plaintiff to Defendant Lorraine Haynes ("Haynes"),[3] a BOE Regional Director, who granted the

request.  (DS ¶¶ 15, 61; PS ¶¶ 15, 61.)  The principal of Springfield Gardens was Defendant

Elizabeth McCullough ("McCullough").[4]  (DS ¶ 13; PS ¶ 13.)  Plaintiff testified that she believed

McCullough "retaliated" against her by "treat[ing] her as a school aide" and forcing her to work

in the mailroom.  (Defs.' Aff. Ex. C at 58.)

In January 2007, Plaintiff was assigned to Hillcrest High School—a school Plaintiff calls

"notoriously horrendous."  (DS ¶ 73; PS ¶ 73.)  Plaintiff claims that this transfer was intended

"as retaliation and punishment."  (PS ¶ 73.)  About a month later, Plaintiff was assigned to a

BOE Regional Operations Center ("Regional Center").  (DS ¶ 76; PS ¶ 76; Pl.'s Aff. Ex. C at 64-

65.)  Plaintiff characterized the Center as a "dumping ground . . . wherein the worst teachers

were consigned: sex offenders, assaulters, malingerers and others not fit to be in a classroom."

(Defs.' Aff. Ex. LL ¶ 15.)  When Plaintiff asked at the Regional Center for a place to pump her

---

[2] Plaintiff appealed the decision terminating her probationary status as an assistant principal; the BOE
upheld the decision in 2009.  (DS ¶ 72, 97-88; PS ¶ 72, 87-88.)  Plaintiff also filed a grievance contesting
Radigan's and Kwait's conclusions, and wrote a letter to Radigan arguing that she had not been
insubordinate, and that Kwait had unjustifiably punished her for taking maternity leave.  (DS ¶¶ 65, 69;
PS ¶¶ 65, 69; Pl.'s Aff. Ex. P.)  Plaintiff's grievance was denied in April 2007 by the Chancellor of the
BOE.  (DS ¶ 83; PS ¶ 83.)

[3] Haynes is incorrectly referred to in the case caption as "Hanes."

[4] McCullough is incorrectly referred to in the case caption as "Mcollough."

breast milk, she was denied a private place to do, and was instead made to sit in a hallway. (Pl.'s Aff. Ex. S at 26.) In March 2007, Haynes pressed Plaintiff to interview for a special education teaching position, which Plaintiff did not want to take, since her own infant daughter was in danger of developing a developmental disability. (DS ¶ 77; PS ¶ 77.) Plaintiff was not selected for the position. (DS ¶ 77; PS ¶ 77.) Plaintiff testified that she believed Haynes pressured her into interviewing for the special education position as "retaliation," and that Haynes was "trying to drive me to the limit to see if I would resign." (Defs.' Aff. Ex. C at 69-70.)

On or about March 5, 2007, Plaintiff was assigned to Humanities and the Arts High School ("Humanities"), "one of the worst NYC Schools" according to Plaintiff. (DS ¶ 79; PS ¶ 79; Defs.' Aff. Ex. LL ¶ 17.) The principal there was Defendant Mercedes Qualls ("Qualls") and the assistant principal was Defendant Nancy Esposito ("Esposito"). (DS ¶¶ 14, 16; PS ¶¶ 14, 16.) When Plaintiff arrived at Humanities, Qualls greeted her with hostility, saying, "What are you doing here? Who sent you here?" (Defs.' Aff. Ex. C at 68-69; Defs.' Aff. Ex. LL ¶ 18.) Plaintiff testified that her transfer to Humanities constituted retaliation because she "wasn't wanted" there. (Defs.' Aff. Ex. C at 70.) In the spring of 2007, Plaintiff requested a six-week unpaid leave to care for her infant daughter, who was experiencing serious medical difficulties; the leave request was approved in April 2007. (DS ¶¶ 80-81; PS ¶¶ 80-81.) Upon learning of the leave, Qualls said to Plaintiff, "I would have hired anybody else instead of taking you in my school and got you processed and you're going to leave now. I should have just gotten somebody else." (Defs.' Aff. Ex. C at 72.) Additionally, Plaintiff testified, Qualls said to her that, if she had told her she would be taking leave "since Day One, I would never [have] allowed you to be in my school building." (Pl.'s Aff. Ex. B at 41.)

In June 2007, after her leave ended, Plaintiff returned to work at Humanities, where Qualls and Esposito refused to give her the keys to her office and only provided her with a bathroom key after she "begg[ed] and plead[ed] for one." (Defs.' Aff. Ex. LL ¶ 23.) Qualls and Esposito treated her "as a complete outsider, and [she] was again forced to perform school aid[e] duties." (Id.) Plaintiff believed that Qualls and Esposito were retaliating against her for taking leave. (Pl.'s Aff. Ex. B at 41.)

At the beginning of the 2007-2008 school year, Plaintiff was reassigned again, this time to Queens Preparatory Academy ("Queens Preparatory")—according to Plaintiff, "another of the worst schools" in the City. (DS ¶ 86; PS ¶ 86; Defs.' Aff. Ex. LL ¶ 27.) There, Plaintiff was assigned a heavier teaching load than her contract permitted. (Defs.' Aff. Ex. C at 75-76.) Furthermore, the Queens Preparatory administration did nothing after she complained of being insulted and intimidated by students. (Id. at 76-77.)

## II.  DISCUSSION

### A.  Anti-Discrimination Laws

#### 1.  The Applicable Statutes

Based on the facts described above, Plaintiff brings claims under Title VII and 42 U.S.C. § 1983. (Am. Compl. ¶¶ 132, 135-141.) Plaintiff's causes of action under both of these statutes are predicated on her claim that Defendants discriminated against her on the basis of her gender, her pregnancy, and her sexual orientation, in violation of Title VII and the Equal Protection Clause. (Id.) Plaintiff alleges that Defendants' discrimination against her took the form of both discrete discriminatory acts and a hostile working environment. (Id.) She also alleges that Defendants retaliated against her based on her "good faith opposition to discriminatory practices." (Id. ¶ 139.) Plaintiff also brings claims under the New York State Human Rights

Law ("SHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law ("CHRL"), N.Y. City Admin. Code § 8-101 et seq. (Id. ¶ 136-40, 142.)[5]

Title VII prohibits "discriminat[ion] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act amended Title VII to make clear that the phrase "because of sex" includes "because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).

Under the SHRL, in relevant part, it is unlawful for an employer, "because of an individual's . . . sexual orientation . . . [or] sex, . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). "Claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." Rojas v. Roman Catholic Diocese of Rochester, – F.3d – , No. 10-4132-cv, 2011 WL 4552460, at *6 n.10 (2d Cir. Oct. 4, 2011) (internal quotation marks omitted). Title VII's prohibition of discrimination on the basis of pregnancy is mirrored by the SHRL. See DeMarco v. CooperVision, Inc., 369 F. App'x 254, 255 (2d Cir. 2010); Gonzalez v. N.Y.S. Office of Mental Health, 26 Misc. 3d 1227(A), at *6 (N.Y. Sup. Ct. Kings Co. 2010).

---

[5] Plaintiff also originally brought claims under 42 U.S.C. §§ 1985 and 1986 and under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (Am. Compl. ¶¶ 133-34, 138-39.) However, she explicitly abandoned these claims in her memorandum of law responding to Defendants' motion. (Pl.'s Mem. (Docket Entry # 47) at 3-4, 23.)

The language of the CHRL is substantively identical to the SHRL. See N.Y. City Admin. Code § 8-107(1)(a). However, the CHRL, as amended by the Local Civil Rights Restoration Act of 2005 ("Restoration Act"), makes clear that it "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." Id. § 8-130. Under the Restoration Act, "interpretations of State or federal provisions worded similarly to City HRL provisions may be used as aids in interpretation only to the extent that the counterpart provisions are viewed 'as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise.'" Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 66-67 (1st Dep't 2009) (quoting § 1 of the Restoration Act); see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) ("[C]laims under the City HRL must be given 'an independent liberal construction . . . .'" (quoting Williams, 61 A.D.3d at 66)).

Section 1983 empowers plaintiffs to bring suit where they have been subject, "under color of any statute, ordinance, regulation, custom, or usage, of any State[,] . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." The right at issue in this case is that secured by the Equal Protection Clause of the Fourteenth Amendment of the Constitution, under which state action that discriminates against women is prohibited unless the state actor demonstrate an "exceedingly persuasive justification" for it. United States v. Virginia, 518 U.S. 515, 531 (1996). To prevail, the state must demonstrate that the discriminatory conduct served "important governmental objectives" and that the means employed were "substantially related to the achievement of those objectives." Id. at 533.

### 2.    Disparate Treatment

In order to survive a motion for summary judgment on a disparate treatment claim—that is, a claim of intentional discrimination—a Title VII plaintiff must satisfy a three-part burden-shifting test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, the plaintiff must establish a prima facie case of discrimination. Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). In order to make out such a prima facie case, the plaintiff must show (1) that she belonged to a protected class; (2) that she was qualified for the employment position she held; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Id. If the plaintiff succeeds in making out a prima facie case, a presumption of discrimination arises and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. Id. If the defendant proffers such a reason, the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). At this stage, "the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 124 (2d Cir. 2004). To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." Id. at 123.

The same burden-shifting analysis that applies to Title VII claims also applies to discrimination claims under § 1983, the SHRL, and the CHRL. See Spiegel v. Schulmann, 604

F.3d 72, 80 (2d Cir. 2010); Back, 365 F.3d at 123 (§ 1983). However, under the CHRL, the plaintiff need not show that she was subject to an "adverse employment action"; instead, she need only show that "she has been treated less well than other employees because of her gender." Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 78 (1st Dep't 2009); see also Kerman-Mastour v. Financial Indus. Regulatory Auth., Inc., No. 10-CV-1633 (RJH), 2011 WL 4526080, at *10 (S.D.N.Y. Sept. 30, 2011).

### 3. Hostile Work Environment

Title VII applies to a plaintiff's claim that she has been forced to work in a "hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). A hostile work environment exists

> [w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

Id. (internal citation and quotation marks omitted). Accordingly, to make out a hostile work environment claim, a plaintiff must present evidence (1) that the conduct in question was "objectively severe or pervasive," that is, that it created an "environment that a reasonable person would find hostile or abusive"; (2) that the plaintiff subjectively perceived the environment as hostile or abusive; and (3) that the plaintiff was subject to the hostile work environment "because of" her sex. Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007). Severity and pervasiveness are independent standards, only one of which the plaintiff must meet. See Pucino v. Verizon Commc'ns, 618 F.3d 112, 119 (2d Cir. 2010). For conduct to be "pervasive" enough to constitute a hostile environment, "the challenged incidents [must be] more than episodic; they must be sufficiently continuous and concerted." Hayut v. State Univ. of N.Y., 352 F.3d 733, 745

15

(2d Cir. 2003) (internal quotation marks omitted). "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2001). However, even a single act can meet the "severity" standard if, "by itself, it can and does work a transformation of the plaintiff's workplace." Id.

"It is axiomatic that to prevail on a claim of hostile work environment based on gender discrimination, the plaintiff must establish that the abuse was based on her gender." Kaytor v. Electric Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010). Circumstantial evidence of an actionable hostile work environment may include evidence of "facially neutral incidents," so long as "a reasonable fact-finder could conclude that they were, in fact, based on sex." Id. (internal quotation marks omitted).

Hostile work environment claims are evaluated under the same standards when brought pursuant to § 1983 or the SHRL. See Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 609 (2d Cir. 2006); Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006). However, under the CHRL, the plaintiff need not demonstrate that the treatment was "severe or pervasive." Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 73-78 (1st Dep't 2009). Instead, the plaintiff need only show that she has been "treated less well than other employees because of her gender." Id. at 78. Even if the plaintiff points to evidence of unequal treatment, the defendant can prevail on summary judgment by proving that the conduct in question "could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." Id. at 80.

### 4.    Retaliation

Title VII also makes it unlawful for an employer to discriminate against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The McDonnell Douglas burden-shifting framework

16

applies to retaliation claims. Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010). In order to make out a prima facie case, the plaintiff must show "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action." Id. The burden of production then shifts to the defendant to articulate a "legitimate non-retaliatory reason for adverse employment action." Id. at 552-53. If the defendant does so, the plaintiff, to avoid summary judgment, must "point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a "substantial reason for the adverse employment action." Id. at 553.

Retaliation claims under the SHRL are analyzed identically to Title VII claims. Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). However, under the CHRL, the plaintiff need not show a "materially adverse employment action." See Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 70 (1st Dep't 2009). Instead, it is unlawful for the employer to retaliate "in any manner." Id. (quoting N.Y. City Admin. Code § 8-107(7)).

**B.     Claims Regarding Individual Defendants Other Than Kwait**

As Plaintiff concedes (Pl.'s Mem. (Docket Entry # 47) at 4), individuals are not liable under Title VII. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 n.8 (2d Cir. 2006). However, under Title VII, employers may be held vicariously liable for unlawful conduct personally committed by supervisory employees. See Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004).

Further, individuals may be held liable under § 1983, to the extent they acted under color of state law. See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir.

2004). To make out a claim against an individual defendant under § 1983, a plaintiff must demonstrate the defendant's personal involvement in the discrimination at issue; there is no respondeat superior liability. Back, 365 F.3d at 127. Personal involvement under § 1983 can be shown by evidence that

> (1) the defendant directly participated in the alleged . . . violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which [unlawful] practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that [unlawful] acts were occurring.

Id. (internal ellipsis omitted).

Individuals are also proper defendants under the SHRL and the CHRL. See Kercado-Clymer v. City of Amsterdam, 370 F. App'x 238, 242 n.1 (2d Cir. 2010); Bind v. City of New York, No. 08-CV-11105 (RJH), 2011 WL 4542897, at *20 (S.D.N.Y. Sept. 30, 2011). To make out a claim against an individual defendant under the SHRL or the CHRL, a plaintiff must either show direct, personal involvement in discriminatory conduct, or that the defendant "aided and abetted" the discrimination or retaliation at issue, Feingold v. New York, 366 F.3d 138, 157-59 (2d Cir. 2004), i.e., that the defendant "'encouraged, condoned or approved'" it, Raneri v. McCarey, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) (quoting State Div. of Human Rights on Complaint of Greene v. St. Elizabeth, 66 N.Y.2d 684, 687 (1985)).

Plaintiff alleges that each of the defendants discussed below discriminated against her based on her pregnancy, gender, and/or sexuality. She also alleges that the individual defendants other than Kwait retaliated against for certain "protected activity," namely her December 2006 letter to Radigan accusing Kwait of discrimination and her January 2008 EEOC charge. (Pl.'s

Mem. at 20-21.) Plaintiff fails to show unlawful conduct by any of the individual defendants other than Kwait.

### 1. Winifred Radigan

Radigan was Kwait's supervisor, and was scheduled to teach the professional development course that Kwait refused to allow Plaintiff to attend. (DS ¶¶ 10-11; Defs.' Aff. Ex. C at 35.) Radigan was also present at the disciplinary conference held after Kwait accused Plaintiff of insubordination; based on Kwait's statements at the conference, Radigan concluded that Plaintiff had, in fact, been insubordinate, thus warranting disciplinary action. (DS ¶ 57; PS ¶ 57.) Radigan reached this conclusion despite Plaintiff's letter to Radigan disputing Kwait's account and accusing Kwait of discriminating against her on the basis of her pregnancy. (Pl.'s Aff. Ex. P.) Radigan also affirmed Kwait's negative performance evaluation of Plaintiff, terminated Plaintiff's probationary service as an assistant principal, and assigned Plaintiff to Springfield Gardens. (DS ¶¶ 57, 70, 72; PS ¶¶ 57, 70, 72; Defs.' Aff. Ex. U.)

Plaintiff cannot make out a discrimination claim against Radigan based on her supervisory position alone. Moreover, the evidence in the record is insufficient to support an inference that Radigan was motivated by discriminatory or retaliatory intent.[6] Therefore, Plaintiff has failed to make out a prima facie case of discrimination or retaliation. Furthermore, there is no evidence that Radigan "aided and abetted" discrimination by encouraging or condoning conduct she *knew* to be discriminatory. Nor is there any evidence of any other type of personal involvement on Radigan's part: there is no evidence that she created a discriminatory policy, that she was "grossly negligent" in supervising Kwait, that she failed to "remedy [a] wrong," or that she was deliberately indifferent to discrimination. While the court is required to

---

[6] Plaintiff's testimony that she heard from her union representative that Radigan "target[ed] young mothers with babies" (Defs.' Aff. Ex. C at 34) was hearsay, and the court will not consider it.

accept as true—as a jury could—Plaintiff's testimony that, contrary to Kwait's accusation, she was not in fact insubordinate, there is no evidence that Radigan *knew* that Kwait's account was false. Radigan was entitled to believe Kwait and to act on that belief by disciplining Plaintiff. See Back, 365 F.3d at 127 (2d Cir. 2004) (evidence that plaintiff's immediate supervisors discriminated against her in recommending that she not be granted tenure was held insufficient to show, on summary judgment, that the school district superintendant, who relied on the supervisors' statements, intended to discriminate against plaintiff in actually denying her tenure).

### 2. Elizabeth McCullough

The only evidence relevant to McCullough is Plaintiff's testimony that she was the principal of Springfield Gardens and that she "retaliated" against Plaintiff by "treat[ing] her as a school aide" and forcing her to work in the mailroom. (DS ¶ 13; PS ¶ 13; Defs.' Aff. Ex. C at 58.) Plaintiff's allegation that McCullough "retaliated" against her is conclusory. There is simply no evidence that McCullough's conduct was motivated by retaliatory, or discriminatory, intent.

### 3. Lorraine Haynes

Plaintiff's claims against Haynes, a BOE Regional Director, appear to be based almost entirely on Haynes's responsibility for approving, or arranging, Plaintiff's assignments to various schools. (DS ¶¶ 15, 61, 73; PS ¶¶ 15, 61, 73.) Based on the quality of these schools, Plaintiff states that the assignments were intended "as retaliation and punishment." (PS ¶ 73.) Plaintiff also testified that Haynes pressured Plaintiff into interviewing for a special education position, and that this pressure was intended to "drive [Plaintiff] to the limit to see if [she] would resign." (DS ¶ 77; PS ¶ 77; Defs.' Aff. Ex. C at 69-70.) Plaintiff's conclusory allegations as to Haynes's motivations are unsupported by any evidence. Plaintiff also alleges that, when assigned to the

20

Regional Center under Haynes's supervision, she was not given a private place to pump her breast milk. (Pl.'s Aff. Ex. S at 26.) There is no evidence that the failure to provide Plaintiff with a place to pump her breast milk was motivated by Haynes's, or anyone else's, discriminatory or retaliatory intent. Therefore, Plaintiff has failed to show that Haynes was personally involved in, or aided and abetted, discrimination or retaliation.

### 4. Mercedes Qualls and Nancy Esposito

Plaintiff's claims against Qualls and Esposito are based on their treatment of her after she was assigned to Humanities, where Qualls was the principal and Esposito the assistant principal. (DS ¶¶ 14, 16, 79; PS ¶¶ 14, 16, 79.) Plaintiff testified that she was treated with hostility by Qualls and Esposito, at first because they apparently did not understand why she was assigned to Humanities, and later because Plaintiff took an unpaid leave to care for her daughter. (DS ¶¶ 80-81; PS ¶¶ 80-81; Defs.' Aff. Ex. C at 68-70; Defs.' Aff. Ex. LL ¶ 18.) In particular, Qualls said that, had she known Plaintiff would take the leave, she "would have hired anybody else instead of taking [Plaintiff]" and would never have "allowed [Plaintiff] to be in [her] school building." (Defs.' Aff. Ex. C at 72; Pl.'s Aff. Ex. B at 41.) Further, after Plaintiff returned from leave, Qualls and Esposito refused to give her the keys to her office, only provided her with a bathroom key after she "begg[ed] and plead[ed] for one," treated her "as a complete outsider," and "forced [her] to perform school aid[e] duties." (Defs.' Aff. Ex. LL ¶ 23; Pl.'s Aff. Ex. B at 41.)

While Plaintiff provides evidence that she was treated badly for taking an unpaid leave, the record does not support a discrimination or retaliation cause of action under any of the standards set forth above. First, Plaintiff fails to make out a prima facie because she has not produced evidence sufficient to give rise to an inference of discriminatory or retaliatory intent. There is no evidence that Qualls's or Esposito's conduct was motivated by Plaintiff's gender,

pregnancy, or sexuality. See Fisher v. Vassar Coll., 70 F.3d 1420, 1448 (2d Cir. 1995) (an employer "may discriminate between those employees who take off long periods of time in order to raise children and those who either do not have children or are able to raise them without an appreciable career interruption. That is not inherently sex specific and does not give rise to a claim under Title VII."). Nor is there any evidence that their conduct was motivated by Plaintiff's claimed "protected" activity, namely her December 2006 letter to Radigan complaining of Kwait's conduct. Indeed, there is no evidence that Qualls or Esposito knew of this letter. Of course, Qualls and Esposito could not have been motivated by the EEOC charge, which was filed after their interaction with Plaintiff.

Nor has Plaintiff demonstrated that Qualls or Esposito subjected her to a materially adverse employment action, as necessary to demonstrate disparate treatment or retaliation under Title VII, § 1983, and the SHRL.

> An "adverse employment action" is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citations, internal quotation marks, and alterations omitted); see also Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) ("The antiretaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." (internal quotation marks and alteration omitted)). Qualls's and Esposito's refusal to give Plaintiff access to her office, their initial refusal to provide a bathroom key, and Plaintiff's assignment to administrative duties amounted to the kind of "inconvenience[s] or . . . alteration[s] of job responsibilities" not covered by Title VII, § 1983, or the SHRL. See Feingold, 366 F.3d at 152.

22

Finally, the conduct at issue was neither sufficiently "severe" nor "pervasive" to constitute an actionable hostile work environment under Title VII, § 1983, or the SHRL.

As discussed above, under the CHRL, Plaintiff need not show a materially adverse employment action or that the hostility she suffered was severe or pervasive. Nevertheless, because the record does not demonstrate discriminatory or retaliatory motive on the part of Qualls or Esposito, Plaintiff cannot make out a CHRL claim against them. See Bateman v. Project Hospitality, Inc., No. 07-CV-2085 (RRM) (RML), 2009 WL 3232856, at *4 (E.D.N.Y. Sept. 30, 2009) (discrimination claims, whether brought under Title VII, the SHRL, or the CHRL, require "facts sufficient to give rise to an inference of discriminatory motive"). Furthermore, Qualls and Esposito have made out the affirmative defense, under the CHRL, that the conduct in question "could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." Williams v. N.Y. City Hous. Auth., 61 A.D.3d 62, 80 (1st Dep't 2009).

### 5. Events at Queens Preparatory

Other than her claims regarding Kwait's conduct, Plaintiff's remaining claims involve her experiences at Queens Preparatory. Plaintiff testified that she was assigned a heavier teaching load than was permitted and that the administration did not act after she complained of being insulted and intimidated by students. (Defs.' Aff. Ex. C at 75-77.) There is no evidence that any of the conduct committed by Queens Preparatory employees was retaliatory or motivated by Plaintiff's gender, sexuality, or pregnancy.

## C.     Claims Based on Kwait's Conduct

### 1.     Title VII

All Title VII claims are barred by the applicable statute of limitations, which Defendants have invoked. (Defs.' Mem. (Docket Entry # 44) at 7-8.) In states like New York that have an agency with the authority to address employment discrimination charges, the statute of limitations for filing a discrimination charge with the EEOC, prior to bringing suit under Title VII, is 300 days. Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 126 (2d Cir. 2010). Since Plaintiff filed her EEOC charge on January 29, 2008 (Defs.' Aff. Ex. LL), her Title VII claims, to be viable, must have accrued after April 4, 2007. Only Plaintiff's job assignments at Humanities and Queens Preparatory took place after April 2007. As explained above, Plaintiff cannot make out a discrimination or retaliation claim based on the conduct that took place at those schools.

Plaintiff attempts to get around the statute of limitations by invoking the "continuing violations" doctrine and the Lilly Ledbetter Fair Pay Act of 2009. However, as discussed below, both of these arguments are unavailing.

### a.     Continuing Violation

Plaintiff argues that she can make out a Title VII claim in connection with pre–April 2007 conduct because it constituted, along with the post–April 2007 conduct, a single "continuing violation." (Pl.'s Mem. at 4-7.)

"To trigger the continuing violation doctrine when challenging discrimination, the plaintiff must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." Shomo v. City of New York, 579 F.3d 176, 182 (2d Cir. 2009) (internal quotation marks omitted). The Supreme Court has made clear that

"discrete discriminatory acts are not actionable if time barred, *even when they are related* to acts alleged in timely filed charges." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (emphasis added). Indeed,

> [d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." [A plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

Id. at 114. The plaintiff in Morgan, on the defendants' motion for summary judgment, presented evidence that, prior to the statute of limitations cutoff date, his employer and its representatives discriminatorily hired him as an electrician's helper rather than an electrician and subjected him to numerous "written counselings" for absenteeism and to racial epithets. Id. at 105 n.1. After the cutoff date, the employer allegedly wrongfully suspended and charged the plaintiff for insubordination, denied him training, falsely accused him of threatening a manager, and terminated his employment. Id. at 115. The Court held that the "discrete" events that occurred prior to the cutoff date—though arguably "related" to those that occurred afterwards—were not actionable. Id.

While Morgan makes clear that a Title VII plaintiff may not base a continuing violation theory on "related" but "discrete" acts, the Court also held that such a theory may be applicable where the plaintiff makes out a hostile work environment claim (as described above)—i.e., a claim of an unlawful employment practice involving the "cumulative effect of individual acts." Id. Where such a hostile work environment exists, there is a "single unlawful practice," such that a court may review all relevant conduct, including that which occurred prior to the statute of limitations cutoff date. Id. at 116-18.

25

Plaintiff argues that she was subjected to an actionable hostile work environment. (Pl.'s Mem. at 18-20.) As discussed above, the events that took place at Humanities and Queens Preparatory were insufficiently "severe" or "pervasive" to make out a hostile work environment. In any event, it is clear that no *single* hostile work environment extended through Plaintiff's transfers from school to school. See, e.g., McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 78 (2d Cir. 2010) (rejecting plaintiff's claim of a single hostile work environment in part because plaintiff switched from one department to another); Fitzgerald v. Henderson, 251 F.3d 345, 364-65 (2d Cir. 2001) (same, where plaintiff alleged two phases of harassment that were "qualitatively different": a first phase where the plaintiff's supervisor made unwanted sexual overtures and a subsequent phases where the supervisor punished the plaintiff for rejecting those overtures). Indeed, in claiming that she was subject to a hostile work environment, Plaintiff focuses solely on her time at John Bowne, which, she claims, was "pervaded with the discriminatory acts of Kwait"—and which ended in November 2006, well before the April 2007 statute of limitations cutoff date. (Id. at 19.)

Instead of a single "hostile work environment" spanning April 2007, the record demonstrates a series of discrete acts insufficient to trigger the continuing violations doctrine. See, e.g., Valtchev v. City of New York, 400 F. App'x 586, 589 (2d Cir. 2010) ("[F]ailure to promote claims and discrete instances of retaliatory action, such as negative evaluations, . . . do not trigger the continuing violation exception."); Benjamin v. Brookhaven Sci. Assocs., LLC, 387 F. Supp. 2d 146, 153 (E.D.N.Y. 2005) ("It is well-settled that alleged adverse employment practices such as failure to promote, failure to compensate adequately, undesirable work transfers, and denial of preferred job assignments are considered discrete acts.").

26

b.      Lilly Ledbetter Act

Plaintiff argues that her Title VII claims are rendered timely by Congress's passage of the

Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5. (Pl.'s Mem. at 6.)  The

Ledbetter Act provides that

> an unlawful employment practice occurs, with respect to discrimination in
> compensation in violation of [Title VII], when a discriminatory compensation
> decision or other practice is adopted, when an individual becomes subject to a
> discriminatory compensation decision or other practice, or when an individual is
> affected by application of a discriminatory compensation decision or other
> practice, including each time wages, benefits, or other compensation is paid,
> resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(e)(3)(A).  Plaintiff argues that the Ledbetter Act applies because, after the

November 2006 disciplinary proceedings and the negative evaluation submitted by Kwait, she

suffered "a demotion in title *and in her pay* in January 2007, the effects of which she is still

feeling today."  (Pl.'s Mem. at 6. (emphasis in original and citations omitted).)

Case law in the Second Circuit and elsewhere makes clear that the Ledbetter Act—under

which a Title VII claim accrues with each paycheck issued pursuant to a "discriminatory

compensation decision or other practice"—applies only to discriminatory employment decisions

specifically related to pay, and not to other employment decisions, even where such decisions

directly affect pay.  That is, the Ledbetter Act applies where the plaintiff claims that she was paid

less than other employees for similar work.  See Noel v. The Boeing Co., 622 F.3d 266, 274 (3d

Cir. 2010) (Ledbetter Act covers claims that employees "were paid differently for performing

equal work" and "not other discrete employment decisions") (internal quotation marks omitted);

Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 374 (D.C. Cir. 2010) (Ledbetter Act

27

applies only to claims that an employer has "pa[id] different wages or provid[ed] different benefits to similarly situated employees").[7] Plaintiff has not made such a claim.

Because neither the continuing violations doctrine nor the Ledbetter Act toll the statute of limitations, all of Plaintiff's Title VII claims are dismissed.

### 2. Section 1983, the SHRL, and the CHRL

The statute of limitations under § 1983, the SHRL, and the CHRL is three years. See Cloverleaf Realty of New York, Inc. v. Town of Wawayanda, 572 F.3d 93, 94 (2d Cir. 2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007); Dawson v. Pelican Mgmt., Inc., No. 11-CV-1753 (KAM) (LB), 2011 WL 5156596, at *5 (E.D.N.Y. Oct. 28, 2011). Since the relevant conduct committed by Kwait took place in late 2006—less than three years before Plaintiff filed her Complaint in July 2008—there is no statute of limitations bar on these claims. Furthermore, Kwait, who acted in his capacity as an employee of the BOE, satisfies the state action requirement of § 1983. See Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122-23 (2d Cir. 2004).

### a. Back and Discrimination Based on Stereotype

In Back, the Second Circuit addressed an Equal Protection–based § 1983 claim brought by a public school psychologist who lost her job soon after she gave birth. Back, 365 F.3d at 113. As the court noted, the case involved the "'fault line between work and family—precisely

---

[7] See also Miller v. Kempthorne, 357 F. App'x 384, 385-86 (2d Cir. 2009) (Ledbetter Act does not apply to failure to promote claim); Robinson v. Brooklyn Coll., No. 09-CV-2174 (DLI), 2010 WL 3924012, at *4 (E.D.N.Y. Sept. 29, 2010) (same); Matthews v. Corning Inc., 737 F. Supp. 2d 133, 136 (W.D.N.Y. 2010) ("[The Ledbetter Act's] scope is limited to claims of discriminatory compensation practices, and courts interpreting it have uniformly held that it does not apply to generalized discrimination claims, including failure to promote. [Plaintiff's] claims are garden-variety discrimination claims, and she does not purport to allege that she was compensated differently from similarly-situated men, or otherwise claim discriminatory compensation. Accordingly, her claims . . . are time-barred.'); Russell v. Cnty. of Nassau, 696 F. Supp. 2d 213, 227-28 (E.D.N.Y. 2010) (applying Ledbetter Act to claimed "discriminatory decision to pay [the plaintiff] less money because of his race," but not to plaintiff's claim that he was removed from a position where pay increases were automatic).

where sex-based overgeneralization has been and remains strongest.'" Id. (quoting Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 738 (2003)). Back, who had previously received consistently positive work evaluations, began to experience criticism from her supervisors—the school principal and the director of personnel services for the local school district—soon after she returned from maternity leave. Id. at 114-15. In particular, her supervisors expressed concern that she would not be able to reconcile being a mother with doing her job well, and that, if she was granted tenure, she would stop demonstrating commitment to her job. Id. at 115. During the same period, Back's supervisors accused her of filing inaccurate reports, not working long enough hours, being disorganized, and having personality conflicts with parents. Id. at 115-16. Based on these evaluations and reports, the school board denied Back's application for tenure and terminated her probationary service as a school psychologist. Id. at 116-17.

In reversing the district court's grant of summary judgment to the defendant supervisors in Back, the Circuit relied largely on Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) and Nevada Department of Human Resources v. Hibbs, 538 U.S. 721 (2003). In Price Waterhouse, six members of the Court agreed that the plaintiff had made out a Title VII gender discrimination claim where her supervisors had denied her bid for partnership based in part on gender stereotypes, evidenced by comments that the plaintiff's appearance and demeanor were insufficiently feminine. Id. at 251 (plurality opinion) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . ."); id. at 259-61 (White, J., concurring); id. at 272-73 (O'Connor, J., concurring) (adverse employment action based on plaintiff's "failure to conform to [gender] stereotypes" was discriminatory); see also United States v. Virginia, 518 U.S. 515, 533 (1996) (the state "must not rely on overbroad generalizations about the different talents,

capacities, or preferences of males and females"). The court in <u>Back</u> found that "the principle of <u>Price Waterhouse</u> . . . applies as much to the supposition that a woman *will* conform to a gender stereotype (and therefore will not, for example, be dedicated to her job), as to the supposition that a woman is unqualified for a position because she does *not* conform to a gender stereotype." <u>Back</u>, 365 F.3d at 119 (emphases in original). Accordingly, the <u>Back</u> court identified a discriminatory stereotype "in the view that a woman cannot 'be a good mother' and have a job that requires long hours, or in the statement that a mother who received tenure 'would not show the same level of commitment [she] had shown because [she] had little ones at home.'" <u>Id.</u> at 120.

In <u>Hibbs</u>, the Court, under § 5 of the Fourteenth Amendment, upheld the constitutionality of the Family and Medical Leave Act ("FMLA"), which guaranteed covered male and female employees twelve weeks of annual unpaid family leave. <u>Hibbs</u>, 538 U.S. at 724. Section 5, the Court found, allows Congress to "remedy" and "deter" violations of the Fourteenth Amendment, but does not permit it to define the substance of the constitutional violations to which the legislation responds. <u>Id.</u> at 727-28. Accordingly, to pass legislation under § 5, Congress must make a record of constitutional violations whose substance has previously been defined by the judiciary and must further demonstrate "'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" <u>Id.</u> (quoting <u>City of Boerne v. Flores</u>, 521 U.S. 507, 520 (1997)). The Court identified the "injury" justifying the FMLA as the continuing reliance by states "on invalid gender stereotypes in the employment context, specifically in the administration of leave benefits," a reliance the Court called "unconstitutional discrimination." <u>Id.</u> at 730. In particular, the Court noted Congress's findings that many employers, including several states, provided far more family leave to women than men (to the

extent men were provided leave at all), thus reflecting the stereotypical view that "caring for family members is women's work" and that "women's family duties trump those in the workplace." Id. at 730-31 & n.5. These "invalid stereotypes," the Court found, constituted "barriers to the hiring, retention, and promotion of women in the workplace." Id. at 734 n.10. Because state leave policies based on such stereotypes could not survive the heightened scrutiny applicable to gender-based discrimination, the Court held that the FMLA was a permissible exercise of Congress's power to remedy constitutional violations under § 5. Id. at 736.

Indeed, the Court went further in describing the constitutional "injury" Congress sought to remedy: in passing the FMLA, "Congress sought to ensure that family-care leave would no longer be stigmatized as an inordinate drain on the workplace caused by female employees and that employers could not evade leave obligations simply by hiring men." Id. at 737. In other words, the Court implied, state employers violate the Constitution not only by acting on the stereotypical view that a woman's place is in the home, but also by basing employment decisions on the presumption that women, due to their family responsibilities, will use excessive resources and therefore be undesirable employees. The Back court, following Hibbs, found that "the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible," are "gender-based" stereotypes and are thus unconstitutional bases for state employment decisions. Back, 365 F.3d at 121.

b.      Disparate Treatment

Plaintiff has made out a prima facie case of discrimination based on gender under § 1983, the SHRL, and the CHRL, along with a prima facie case of pregnancy discrimination under the SHRL and the CHRL.[8] There is no dispute as to the first two elements of a prima facie case: that

---

[8] Absolutely no evidence supports Plaintiff's claim that she was discriminated against based on her heterosexuality.

Plaintiff, as a woman, was in a protected class and that she was qualified for her position as assistant principal. See Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). Nor is there any question that Plaintiff's ultimate demotion and significant loss of salary, which resulted from Kwait's accusation of insubordination, constituted an adverse employment action, thus meeting the third element of a prima facie case. See Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) ("demotion evidenced by a decrease in wage or salary [or] a less distinguished title" constitutes adverse employment action).

As to the fourth and final element, Plaintiff has pointed to evidence sufficient to give rise to an inference that Kwait acted with discriminatory intent, as defined by the Second Circuit in Back. Drawing all inferences in Plaintiff's favor, the court takes particular note of the following facts:

> (1) Kwait admonished the John Bowne staff to do their jobs "to the fullest," whether or not they had "families or kids to attend to."
>
> (2) Prior to Plaintiff's maternity leave, Kwait generally exhibited hostility toward her and scrutinized her closely, particularly monitoring her bathroom usage and "yelling" at her if he observed her using the bathroom during class.
>
> (3) Kwait did not permit Plaintiff to attend a teacher development course, saying, "Well, you're pregnant, so it doesn't matter if you get to the training or not."
>
> (4) Even though Kwait had told Plaintiff that she would only need a doctor's note if she returned to work *less* than six weeks after giving birth, he insisted on a note when she returned exactly six weeks after giving birth.
>
> (5) On the day Plaintiff returned, Kwait ordered her to leave the building for no reason other than his anger at her for "wasting" his time and for insisting that she could not wait until 5:00 p.m. to meet since she had to take care of her baby.
>
> (6) At a disciplinary conference held a week later, Kwait falsely stated that Plaintiff had disobeyed his order to leave the building, when in fact she had obeyed him.

(7) At the same conference, he falsely claimed that Plaintiff's doctor had not cleared her to return to work, even though the "corrected" doctor's note stated that she was, in fact, cleared for work.

(8) In a negative evaluation of Plaintiff, Kwait reiterated his false account of her insubordination and noted Plaintiff's "excessive absences." Plaintiff had only been absent during her maternity leave.

These facts are sufficient, at this stage, to support an inference that Kwait acted to remove Plaintiff as his assistant principal based on an impermissibly stereotypical view that she, first as a pregnant woman and subsequently as a new mother, would fail to demonstrate sufficient commitment to her work and would be a poor employee.

A jury could reasonably conclude that Kwait's comment to staff that they would need to devote themselves to their jobs whether or not they had children evidenced a suspicion that those with children generally lacked commitment to work. Kwait's hostility to Plaintiff as her due date approached, particularly in connection with her frequent bathroom breaks—a common issue for pregnant women[9]—could be seen by a jury as evidence of a view that pregnant women lacked diligence or require undue accommodation. A jury could also conclude that Kwait doubted the commitment of pregnant women based on his comment that, because Plaintiff was pregnant, it did not "matter" whether she took the teacher development course. Finally, the events stemming from Plaintiff's return to John Bowne after her maternity leave support an inference that Kwait acted with discriminatory intent. A jury could reasonably conclude that Kwait insisted on an unnecessary doctor's note and falsely claimed that Plaintiff had been insubordinate in order to prevent her return to work at John Bowne, despite the lack of a legitimate reason for doing so. A

---

[9] See Maldonado v. U.S. Bank, 186 F.3d 759, 767 (7th Cir. 1999) ("Pregnancy causes normal inconveniences that might 'interrupt the workplace's daily routines,' including, for example, the need to take more frequent snack and restroom breaks . . . ." (quoting Judith G. Greenberg, The Pregnancy Discrimination Act: Legitimating Discrimination Against Pregnant Women in the Workforce, 50 Me. L. Rev. 225, 250 (1998)).

jury could further conclude that he was motivated, at least in part, by stereotypical views regarding the commitment and competence of pregnant women and new mothers. See Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 434, 436 (8th Cir. 1998) (requiring pregnant employee to produce unnecessary doctor's note before being permitted to work was evidence of pregnancy discrimination).

The evidence for Kwait's discriminatory intent is circumstantial and less direct than the evidence supporting the plaintiff's claims in Back. However, "[s]ummary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (internal quotation marks omitted); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 146 (2000) (since "there will seldom be 'eyewitness' testimony as to the employer's mental processes," a plaintiff may defeat summary judgment "based principally" on "circumstantial" or "indirect" evidence of discrimination (internal alterations and quotation marks omitted)); Back, 365 F.3d at 121 (noting that an employer's conduct based on gender stereotypes may be "subtle" and "difficult to detect" (quoting Hibbs, 538 U.S. at 736)); Sassaman v. Gamache, 566 F.3d 307, 313 (2d Cir. 2009) ("Insofar as [a] comment might be ambiguous, it is [the court's] obligation at [the summary judgment] stage to interpret ambiguities in the evidence in the light most favorable to the plaintiff." (internal quotation marks omitted)).

Furthermore, courts, in rejecting summary judgment in similar cases, have taken judicial notice of the real-world prevalence of the stereotype that pregnant women and young mothers will make undesirable employees. See Back, 365 F.3d at 121 ("[T]he Supreme Court itself recently took judicial notice of such stereotypes." (discussing Hibbs)); Chadwick v. Wellpoint, Inc., 561 F.3d 38, 48 (1st Cir. 2009) (reversing grant of summary judgment in light of the

34

"common stereotype about the job performance of women with children and . . . the surrounding circumstantial evidence" presented by plaintiff). The frequency of such stereotypes has been confirmed in numerous studies.[10] The court takes the recognized pervasiveness of such gender stereotypes into account in finding that the record is sufficient for a reasonable jury to infer that such a stereotype motivated Kwait.

Kwait has satisfied his burden of production at step two of the McDonnell Douglas framework by articulating a reason for the adverse action taken against Plaintiff—namely, her alleged insubordination. (Defs.' Mem. at 14.) However, a jury that accepted Plaintiff's testimony that she was not in fact insubordinate would have to reject this reason as false. A showing that the employer's proffered reason for the adverse employment action was false, along with the showing necessary to make out a prima facie case, may, though it need not, be sufficient to defeat summary judgment. That is, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . . Proof that the

---

[10] See Stephen Benard et al., Cognitive Bias and the Motherhood Penalty, 59 Hastings L.J. 1359, 1370-77 (2008) (discussing studies finding that both pregnant women and mothers—though not fathers—are viewed as relatively less qualified for employment, less competent, less reliable, and less committed to work, and are held to relatively higher work standards); U.S. Equal Employment Opportunity Commission, Enforcement Guidance: Unlawful Disparate Treatment of Workers With Caregiving Responsibilities 6 (2007) ("[W]omen with caregiving responsibilities may be perceived as more committed to caregiving than to their jobs and as less competent than other workers, regardless of how their caregiving responsibilities actually impact their work." (citing Shelley Correll & Stephen Benard, Getting a Job: Is There a Motherhood Penalty? (2005) (showing that women with children were recommended for hire and promotion at a much lower rate than women without children))); id. at 19 ("Once female workers have children, they may be perceived by employers as being less capable and skilled than their childless female counterparts or their male counterparts, regardless of whether the male employees have children." (citing Amy J.C. Cuddy et al., When Professionals Become Mothers, Warmth Doesn't Cut the Ice, 60 J. Soc. Issues 701, 711 (2004) ("Not only are [working mothers] viewed as less competent and less worthy of training than their childless female counterparts, they are also viewed as less competent than they were before they had children. Merely adding a child caused people to view the woman as lower on traits such as capable and skillful, and decreased people's interest in training, hiring, and promoting her."))); Joan C. Williams, *Hibbs as a Federalism Case; Hibbs as a Maternal Wall Case*, 73 U. Cincinnati L. Rev. 365, 388 (2004) ("One study found that performance reviews of female managers 'plummeted' after pregnancy, in part because pregnancy triggers the stereotype of women as irrational and overly emotional." (citing Jane Halpert et al., Pregnancy as a Source of Bias in Performance Appraisals, 14 J. Org. Behav. 649, 650-55 (1993))).

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Reeves, 530 U.S. at 147 (emphasis in original). "Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Id. at 147 (internal quotation marks omitted); see also James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000) ("[I]in some circumstances the prima facie case and/or evidence of falsity might give powerful evidence of discrimination—more than enough to sustain a plaintiff's verdict—but in others, the two together might fall far short of providing evidence from which a reasonable inference of discrimination could be drawn."). In the instant case, the evidence supporting Plaintiff's prima facie case, along with the evidence that Kwait's proffered explanation for the adverse employment action was false, are sufficient to defeat summary judgment on the issue of Kwait's discriminatory intent.

"Of course, to prove employment discrimination, the plaintiff must show more than invidious intent. She must also demonstrate that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct." Back, 365 F.3d at 125 (internal quotation marks omitted). That requirement is met here. As in Back, Kwait was Plaintiff's "immediate supervisor[]" and was "responsible for evaluating [her] performance." Id. Kwait "issued a direct recommendation against her tenure," id., as assistant principal to his own supervisor, Radigan, who had authority as to whether to terminate Plaintiff's probationary period, and did so, based solely on Kwait's statements. This sequence of events is sufficient to show causation. See id.

Furthermore, Kwait is not entitled to qualified immunity as to the § 1983 claim. "Public officials sued in their individual capacity are entitled to qualified immunity from suit unless '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that

what he is doing violates that right.'" Back, 365 F.3d at 129 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alterations in original). Accordingly, in determining whether the official enjoys qualified immunity, a court must consider

> (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Id. at 129-30 (internal quotation marks omitted). To the extent that Kwait did in fact act based on discriminatory assumptions regarding Plaintiff's competence and commitment as a pregnant woman and then as a new mother, it is clear, after Back, that he reasonably should have understood that his conduct was unlawful. Therefore, he is not entitled to qualified immunity.

Accordingly, Plaintiff's disparate treatment causes of action against Kwait for gender discrimination under § 1983, the SHRL, and the CHRL will go forward, as will her disparate treatment causes of action for pregnancy discrimination under the SHRL and the CHRL.[11]

c.      Hostile Work Environment

The court must look at "all the circumstances" in deciding a hostile work environment claim. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002). Kwait's conduct prior

---

[11] In Geduldig v. Aiello, 417 U.S. 484 (1974), in which the Supreme Court upheld the constitutionality of a disability insurance program that excluded pregnancy-related disabilities, the Court found that, "[a]bsent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition." Id. at 496 n.20. Thus, under Geduldig, a plaintiff may not state a claim under § 1983 for pure pregnancy discrimination, without alleging that the conduct in question also discriminated on the basis of gender. Geduldig has not been overruled, though Hibbs and Back make clear that discrimination based on *stereotypical assumptions regarding pregnant* women does violate the Equal Protection Clause. See Reva B. Siegel, You've Come a Long Way, Baby: Rehnquist's New Approach to Pregnancy Discrimination in *Hibbs*, 58 Stan. L. Rev. 1871, 1892 (2006) ("[Geduldig] leaves open the possibility that some legislative classifications concerning pregnancy are sex-based classifications . . . . We might read Hibbs as limiting Geduldig sub silentio, but it seems as reasonable to read Hibbs as answering the question Geduldig reserved. Where regulation of pregnant women rests on sex-role stereotypes, it is sex-based state action within the meaning of the Equal Protection Clause.").

to Plaintiff's maternity leave—during which he made Plaintiff hire a Spanish teacher even though such an assignment went beyond her contract; did not excuse Plaintiff from hallway and cafeteria duty, despite her pregnancy; subjected Plaintiff to intense scrutiny, including of her bathroom usage, and "yelled" at her for using the bathroom; expressed "disdain" for Plaintiff; and prevented Plaintiff from attending a teacher development course—may have been insufficient to make out a hostile work environment claim. See Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. 2008) ("derogatory language," "dismissive comments," and "intense scrutiny" insufficient to make out hostile work environment claim). However, when this conduct is viewed alongside Kwait's conduct after Plaintiff's return from maternity leave, it is clear that summary judgment would be inappropriate. As discussed above, if the record is read in Plaintiff's favor, as required at this stage, it appears that Kwait forced Plaintiff to produce unnecessary doctor's notes, ordered her to leave the school without justification, and then falsified an account of her insubordination. Taking the record as a whole, Plaintiff has demonstrated that a reasonable person would view her work environment as hostile or abusive, that she experienced the environment as such, and that such hostility was created "because of" her sex. She has therefore produced sufficient evidence to withstand summary judgment on her hostile work environment claim under § 1983, the SHRL, and the CHRL.

### d. Liability of the BOE

A school district can be held liable under § 1983, but only if its "'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" See Back, 365 F.3d at 128 (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). Nothing in the record indicates that the BOE maintained a custom or official policy of gender-based discrimination. Thus, at issue here is whether Kwait's

position was such that his conduct could fairly be said to "represent official policy." Id. As the Second Circuit has made clear, a municipality or municipal agency can only be held liable for the conduct of an official where that official "ha[d] final authority over significant matters involving the exercise of discretion . . . . An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." Rookard v. Health and Hosps. Corp., 710 F.2d 41, 45 (2d Cir. 1983).

District courts in the Second Circuit have found that a public school principal acts as a final policymaker to the extent that the ultimate harm that befell the plaintiff was under the principal's control. See Williams v. Bd. of Educ.–City of Buffalo, No. 07-CV-698C (JTC), 2008 WL 2946003, at *3 (W.D.N.Y. July 29, 2008) (harassment by principal himself); Lovell v. Comsewogue Sch. Dist., 214 F. Supp. 2d 319, 324 (E.D.N.Y. 2002) (principal failed to prevent students from harassing homosexual teacher); Rabideau v. Beekmantown Cent. School Dist., 89 F. Supp. 2d 263, 268-69 (N.D.N.Y. 2000) (principal acquiesced in teacher's violation of student's first amendment rights); see also T.Z. v. City of New York, 635 F. Supp. 2d 152, 179 n.27 (E.D.N.Y. 2009) ("A school principal has final policymaking authority in the management of the school and her conduct represents official district policy within the purview of the school."). Because Kwait was fully and finally responsible for any hostile work environment to which he subjected Plaintiff, this conduct can be attributed to the BOE.

However, Plaintiff cannot make out a Monell claim against the BOE based on the termination of her probation or her demotion. Although the record supports the view that Kwait's discriminatory conduct proximately caused Plaintiff's discipline and demotion, he did not have "final authority" over those events. Instead, the record shows that it was Radigan, not Kwait, who made the final decision as to Plaintiff's probation and demotion. Therefore, the

BOE cannot be held liable in connection with the disparate treatment claim. See Back, 365 F.3d at 128-29 (local school board not liable under § 1983 for discriminatory acts of school principal who influenced board's decision to deny plaintiff tenure).

Nor can the BOE be held liable under the SHRL or the CHRL. New York law mandates that no action, "for any cause whatever," "shall be prosecuted or maintained against any school district [or] board of education . . . unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action . . . is founded was presented to the governing body of said district or school within three months after the accrual of such claim." N.Y. Educ. Law § 3813(1). Furthermore, with exceptions not applicable here, no such action "shall be commenced . . . more than one year after the cause of action arose." Id. § 3813(2-b). Since these provisions apply to actions "for any cause whatever," they necessarily apply to discrimination claims. See Bucalo v. East Hampton Union Free Sch. Dist. 351 F. Supp. 2d 33, 35-36 (E.D.N.Y. 2005); Fierro v. City of New York, 591 F. Supp. 2d 431, 446-47 (S.D.N.Y. 2008), rev'd on other grounds, 341 F. App'x 696 (2d Cir. 2009).[12]

As Defendants point out, nothing in the record indicates that Plaintiff served a notice of claim on the BOE within the requisite three months. (Defs.' Mem. at 23-24.) Furthermore, Kwait's conduct occurred more than one year before Plaintiff filed her Complaint in July 2008. (Id.) Therefore, all claims against the BOE under the SHRL and the CHRL must be dismissed.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's disparate treatment and hostile work environment claims

---

[12] Section 3813 applies to claims against "any officer of a school district [or] board of education." N.Y. Educ. Law § 3813(1). However, the provision does not apply to Plaintiff's claims against Kwait, since Kwait was not such an "officer." See Fierro, 591 F. Supp. at 447 (school principal not an "officer" under § 3813).

against Kwait, under § 1983, the SHRL, and the CHRL, shall proceed. Plaintiff's § 1983 claim against the BOE, based on her hostile work environment claim against Kwait, shall also proceed. All other claims are DISMISSED.

SO ORDERED.                                          s/Nicholas G. Garaufis

Dated: Brooklyn, New York                            NICHOLAS G. GARAUFIS
     November _17_, 2011                            United States District Judge